AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)        ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| United States of America | |
| v. | |
| GAVIN EMILIANO VELASCO and JESUS MALDONADO ROJAS, | |
| Defendants | |

<div style="border:1px solid black">

**FILED**
CLERK, U.S. DISTRICT COURT

Sept. 4, 2024

**CENTRAL DISTRICT OF CALIFORNIA**
BY: ____tsn____ DEPUTY
</div>

Case No.

**2:24-mj-05364-DUTY**

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of August 26, 2024, in the county of Los Angeles in the Central District of California, the defendants violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2114 | Armed Robbery of a United States Postal Carrier |
| 18 U.S.C. § 924(c) | Carrying and Brandishing a Firearm During and in Relation to a Crime of Violence |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/ Katherine Trivino*
Complainant's signature

_____
Katherine Trivino, Postal Inspector
Printed name and title

AUSA: Kenneth R. Carbajal, x3172

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

telephone. Date: September 4, 2024

_Judge's signature_

City and state:   Los Angeles, California

Hon. Stephanie S. Christensen, U.S. Magistrate Judge
_Printed name and title_

AUSA: Kenneth R. Carbajal, x3172

## AFFIDAVIT

I, Katherine Trivino, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1.     This affidavit is made in support of a criminal complaint and arrest warrants against Gavin Emiliano Velasco ("VELASCO") and Jesus Maldonado Rojas ("ROJAS") for a violation of 18 U.S.C. § 2114 (Armed Robbery of a United States Postal Carrier) and 18 U.S.C. § 924(c) (Carrying and Brandishing a Firearm During and in Relation to a Crime of Violence).

2.     This affidavit is also made in support of an application for a warrant to search the following digital devices (the "SUBJECT DEVICES"), in the custody of the United States Postal Inspection Service ("USPIS"), in Los Angeles, California, as described more fully in Attachment A:

    a.     A light blue Apple iPhone 14 with a cracked screen and cracked rear bearing serial number LV4YWC169Q and IMEI 35 080823 792420 6 ("SUBJECT DEVICE 1") belonging to VELASCO; and

    b.     A dark blue Apple iPhone 12 with a chipped screen bearing serial number H4YJWVW30DXP and IMEI 35 660664 840488 1 ("SUBJECT DEVICE 2") belonging to ROJAS.

3.     The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 18

1

U.S.C. §§ 2114 (Armed Robbery of a United States Postal Carrier), 1951 (Hobbs Act Robbery), 111 (Assault on a Federal Employee), 1704 (Theft or Unlawful Possession of Postal Keys), 1708 (Mail Theft and Possession of Stolen Mail), 1028 (Fraud and Related Activity in Connection with Identification Documents, Authentication Features, and Information), 371 (Conspiracy to Commit the Aforementioned Offenses), 924(c) (Carrying and Brandishing a Firearm During and in Relation to, or Possessing a Firearm in Furtherance of, a Crime of Violence) (the "SUBJECT OFFENSES"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the complaint and requested warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and all dates and times are on or about those indicated.

## II.  BACKGROUND OF AFFIANT

5.    I am a Postal Inspector with the USPIS and have been so employed since July 2023. I completed a 16-week basic

2

training course in Potomac, Maryland, which included training in
mail theft and postal related robbery investigations.  I am
currently assigned to the Los Angeles Division, Coastal Mail
Theft and Violent Crimes Team ("Mail Theft Team").  My
responsibilities include the investigation of crimes against the
United States Postal Service ("USPS") and crimes related to the
misuse and attack of the mail system, including theft of the
United States mail ("U.S. Mail"), possession of stolen U.S.
Mail, and crimes related to the use, theft or counterfeiting of
USPS keys and locks, postal robberies.  I also investigate
crimes in connection with access devices that include credit
cards and debit cards, identity theft, and the unauthorized use
of other persons' information for financial gain, as these
criminal schemes often are perpetrated through the U.S. Mail.

### III.  SUMMARY OF PROBABLE CAUSE

6.   On August 26, 2024, three men robbed USPS Letter
Carrier M.M. of his USPS-issued mail keys while M.M. was working
his USPS mail-delivery route.  During the robbery, one of the
men brandished a gun and told M.M. to give him everything. M.M.
gave the men USPS mail keys, a USPS satchel containing an
unknown amount of mail pieces, and a USPS scanner. The men fled
the area in a dark gray Dodge Journey (the "Dodge").

7.   On August 29, 2024, Torrance Police Department ("TPD")
Officers Burnetti and Lopez saw a man wearing a gray hooded

sweater who appeared to be tampering with a blue USPS collection box. TPD Officers Burnetti and Lopez approached the USPS collection box to determine if it had been burglarized, and the man they had seen tampering with the box had fled the area on foot. TPD Officers Burnetti and Lopez saw the Dodge parked nearby with two men sitting inside. TPD Burnetti and Lopez executed a felony traffic stop and detained the two men, later identified as VELASCO and ROJAS. Officers searched the Dodge and recovered a loaded gun underneath the front passenger seat, a USPS mail tub, approximately 18 checks, and multiple pieces of U.S. Mail in names other than VELASCO or ROJAS.

8.    In a Mirandized interview, VELASCO admitted to robbing a USPS letter carrier on August 26, 2024, in Torrance, California, along with two other individuals. VELASCO stated the USPS letter carrier handed over the USPS keys, satchel, and scanner once he brandished the gun. VELASCO admitted to being the "mastermind" behind the plan to rob a USPS letter carrier to obtain USPS keys in order to steal mail.

## IV.    STATEMENT OF PROBABLE CAUSE

### A. Three Men Conduct an Armed Robbery of USPS Letter Carrier M.M. on August 26, 2024

9.    Based on my training and experience, review of surveillance videos, review of reports and other documents prepared by law enforcement officers, my conversations with law

4

enforcement officers, and my personal involvement in this
investigation, I am aware of the following:

     a.   During the morning of August 26, 2024, victim
M.M. was in the field working as a USPS letter carrier, carrying
out his duties delivering mail on behalf of USPS.

     b.   At approximately 10:25 a.m., M.M. was returning
to his USPS vehicle when he was approached by three men near
16120 Van Ness Avenue in Torrance, California. One of the men
(later identified as VELASCO, as discussed below) drew a handgun
from the front of his waistband and brandished the gun to M.M.
The man later identified as VELASCO ordered M.M. to give him the
USPS keys and satchel. M.M. handed over a keyring containing a
USPS Arrow Key, a USPS Modified Arrow Lock ("MAL") Key, a USPS
vehicle key, a USPS scanner, a USPS satchel, and U.S. Mail that
was contained within the satchel. The three men fled on foot.

     c.   M.M. described the three men as Hispanic,
approximately 20 years old, wearing hoodies (hooded sweaters)
and masks/bandanas. M.M. described the gun as a two-tone, black
and olive green, Glock-style handgun. M.M. believed the gun was
a real handgun.

     d.   TPD officers responded to the scene of the
robbery and canvassed the area for surveillance video. TPD
officers recovered surveillance video from a nearby apartment
building which showed the suspects parked the Dodge in a parking

lot behind the apartment building where the robbery occurred. Three men exited the Dodge and walked towards West 162nd Street in Torrance, California. The three men walked northbound on Van Ness Avenue and approached M.M. on the sidewalk near his USPS vehicle. The first suspect ("SUBJECT 1") wore a dark-colored hooded sweater with white markings resembling flowers, dark-colored pants, white shoes, and a black mask. The second suspect (later identified as VELASCO) wore a black t-shirt, blue latex gloves, light colored pants, a black face mask, and black shoes. The third suspect ("SUBJECT 3") wore a white hooded sweater, a black face mask, and black pants. SUBJECT 1 grabbed the USPS satchel from M.M. VELASCO reached to the front side of M.M.'s person and an item dropped to the ground. VELASCO picked up the item with one hand and appeared to be holding a gun in his other hand. SUBJECT 3 appeared to pat down the front of M.M.'s person as if he were searching for other items to take. The three suspects then ran around the corner and returned to the Dodge and fled the area.

**B.   TPD Identifies the Dodge**

10.  Based on my training and experience, review of surveillance videos, review of reports and other documents prepared by law enforcement officers, my conversations with law enforcement officers, and my personal involvement in this investigation, I am aware of the following:

a.   On August 27, 2024, TPD Officers Burnetti and Lopez reviewed the surveillance video that was recovered from the USPS letter carrier robbery on August 26, 2024. The officers noted the Dodge had traffic collision damage and a spare tire on the front passenger side. TPD officers used law enforcement databases to determine the Dodge was a four-door, 2015 Dodge Journey, bearing CA license plate 9KVR993.

**C.  TPD Officers Locate and Search the Dodge and Arrest VELASCO and ROJAS**

11.  Based on my training and experience, review of surveillance videos, review of reports and other documents prepared by law enforcement officers, my conversations with law enforcement officers, and my personal involvement in this investigation, I am aware of the following:

a.   On August 29, 2024, TPD Officers Burnetti and Lopez were patrolling the area of Torrance, California. They were driving eastbound on Artesia Boulevard at Yukon Avenue when Officer Lopez saw a Hispanic male wearing a black face mask, gray hooded sweater, and blue jeans walking towards a USPS collection box located on the sidewalk near 3615 Artesia Boulevard. The male appeared to be tampering with the USPS collection box, so the officers went to inspect if the USPS collection box had been burglarized.

7

b.    When the TPD officers examined the USPS collection box, they noticed the same unknown male wearing a gray hooded sweater running westbound on Artesia Boulevard and into an apartment complex on the west side of Artesia Boulevard. While attempting to locate the unknown male, the officers saw the Dodge parked in front of 3635 Artesia Boulevard. Officers saw that the Dodge had body damage and a spare tire on the front passenger side, just like the vehicle used in the August 26, 2024, robbery.

c.    The officers approached the Dodge, saw two male occupants seated in the Dodge, and ordered them out of the car. The two males were immediately detained and later identified as VELASCO and ROJAS. ROJAS, seated in the driver's seat of the Dodge, was wearing a distinct hooded sweater that appeared to be the same one worn by one of the men captured on surveillance during the armed robbery on August 26, 2024; it was black with white markings resembling flowers. VELASCO was seated in the front passenger seat of the Dodge at the time of arrest.

d.    Once VELASCO and ROJAS got out of the car, TPD officers saw a white USPS mail tub through the rear window.

e.    TPD Officer Gonsalves saw a black handgun slide underneath the front passenger seat. From outside the car, Officer Gonsalves saw that the firearm had a grey-colored frame and that it was not secured in a holster. He recovered the

8

handgun and removed a magazine containing multiple 9mm rounds of ammunition. The handgun was later identified as an un-registered and un-serialized weapon known as a "ghost gun." TPD officers located an olive-green colored handgun slide in the glove compartment. The firearm and green slide appeared to match the handgun used in the armed robbery on August 26, 2024.

    f.    Officers recovered additional items from the Dodge, including (1) a white face mask; (2) black and white gloves in the driver side door panel; (3) blue surgical gloves on the driver side floorboard which appeared similar to gloves worn by the robbers during the robbery; (4) checks made payable to names other than VELASCO or ROJAS; (5) approximately 274 9mm rounds of ammunition; (6) approximately 43 shotgun shells; (7) a USPS mail tub discussed above; (8) erasers; (9) a Bank Of America debit card belonging to VELASCO; (10) access devices not in the names of VELASCO or ROJAS; (11) clothing items consistent with clothing worn by the suspects during the armed robbery on August 26, 2024 including a white hooded sweater; and (12) U.S. Mail.

    g.    TPD officers recovered SUBJECT DEVICE 1 from VELASCO and SUBJECT DEVICE 2 from ROJAS. VELASCO provided the passcode for SUBJECT DEVICE 1 to TPD Officers.

9

D. **In a Mirandized Interview, VELASCO Admitted to Having Robbed M.M. and Utilized Stolen USPS Keys to Steal U.S. Mail**

12.   Based on my training and experience, review of surveillance videos, review of reports and other documents prepared by law enforcement officers, my conversations with law enforcement officers, and my personal involvement in this investigation, I am aware of the following:

   a.   On August 29, 2024, TPD Detective Sean O'Rourke and Inspectors Ramirez and Ireland conducted an interview of VELASCO.

   b.   At approximately 4:47 PM, Inspector Ireland advised VELASCO of his *Miranda* Rights, who verbally stated he understood his rights. VELASCO signed a waiver of rights indicating his desire to speak with the investigators.

   c.   VELASCO admitted to planning the armed robbery on August 26, 2024, with two other individuals agreeing to go along with the plan; the plan was discussed the previous day on August 25, 2024. VELASCO stated Torrance was a good target to rob a USPS letter carrier as Torrance is known to have several businesses which likely send checks via the U.S. Mail. VELASCO stated the purpose of the armed robbery was to steal USPS keys to make it easier to steal U.S. Mail containing checks, which would then be sold.

10

d.   VELASCO admitted that he and the two other individuals robbed M.M. and took the USPS keys, satchel, and scanner. VELASCO admitted he was carrying a handgun in his waistband and once he approached M.M., VELASCO pulled the handgun out of his waistband to scare M.M. VELASCO said he did not point the handgun directly at M.M. VELASCO stated the handgun recovered in the arrest was the firearm he used during the robbery. VELASCO said the dark green slide did not originally come with the handgun and that he purchased the weapon; he admitted it was a ghost gun because it was not made in a factory. VELASCO said he knew the handgun had the capability to shoot real bullets but had never fired the weapon himself.

e.   VELASCO said at the time of the robbery on August 26, 2024, he was wearing a black t-shirt, blue jeans, Nike Jordan 11 shoes, and a ski mask. This outfit was the same clothing he wore at the time of his arrest, except for the shirt.

f.   VELASCO said he used the stolen USPS keys on August 26 and 28, 2024 to steal mail and a white USPS mail tub from an apartment complex mailbox and a USPS collection box in Torrance.

g.   VELASCO said the plan was to rob only one USPS letter carrier because once he had one key, that would be enough

11

to steal the U.S. Mail. VELASCO admitted that if the USPS letter carrier did not comply, he would have used physical force to obtain the USPS keys.

        h.   VELASCO said the first time he ever stole checks from the U.S. Mail was on August 26, 2024, but admitted he had previously sold stolen checks. VELASCO said he had been selling stolen checks for approximately three to five weeks for 10% of the check's face value. VELASCO confirmed he does not cash/negotiate the stolen checks.

        i.   VELASCO admitted he learned about the idea to steal and sell checks via social media platforms such as TikTok and Instagram. VELASCO said he finds social media users who post keywords such as "glass" and "slips" to communicate with others that want to buy stolen checks. VELASCO admitted to also using his own social media platforms to sell stolen checks. VELASCO admitted to having recently sold one $8000 check for $800 and two $2,000 checks for $200 each.

**E. VELASCO Provides Consent to Search His Phone**

    13.  Based on my training and experience, review of surveillance videos, review of reports and other documents prepared by law enforcement officers, my conversations with law enforcement officers, and my personal involvement in this investigation, I am aware of the following:

a.    Inspector Ireland provided VELASCO a Consent to Search Electronic Devices form; VELASCO stated he understood his rights, signed the form, and provided the passcode to SUBJECT DEVICE 1.

b.    On August 29, 2024, Inspectors Ramirez, Taing, and I conducted a cursory search of SUBJECT DEVICE 1 and observed the following:

i.    Various photographs saved in the camera roll showing a male appearing to be VELASCO, holding large quantities of U.S. currency;

ii.   The clothing and ski/face mask in the photographs appeared to be the same or similar clothing to what was worn during the armed robbery on August 26, 2024, and during the arrest of VELASCO and ROJAS on August 29, 2024;

iii.  Photographs and videos saved in the camera roll showing two handguns, one of which matched the description of the handgun that was used in the armed robbery on August 26, 2024, which was recovered at the time of the arrest on August 29, 2024;

iv.   A photograph of one male wearing clothing similar to what was worn by SUBJECT 1 at the time of the armed robbery;

v.    Photographs of access devices not in the names of VELASCO or ROJAS;

13

vi.    A video showing a TikTok post from a username '@..bankkkkk' which displayed U.S. currency fanned out showing a variety of dollar amounts, likely over approximately $2,500 based on what I could observe;

vii.   Multiple contacts saved in the contacts list with the name "Plug." Based on my training and experience, I understand "plug" refers to someone who is a resource for obtaining something valuable that would otherwise be difficult to obtain.;

viii.    A photograph of a conversation involving the name "Almir" on June 4, year unknown; the conversation was pertaining to an individual expressing concern of being caught committing bank fraud;

ix.    Several notes saved on a note application containing usernames, passwords, personal identification numbers ("PIN"), "addresses on file with bank", addresses, phone numbers, and email addresses.

**V.    <u>Training and Experience Regarding Subject Offenses</u>**

14.    Based on my training and experience investigating mail and identity theft and robbery offenses, and information I have obtained from other law enforcement officers who investigate the same offenses, I know the following:

a.    People who steal mail are often involved in fraud and identity-theft crimes.  These individuals typically steal

14

mail looking for checks, access devices, other personal identifying information (such as names, Social Security numbers, and dates of birth), and identification documents that they can use to fraudulently obtain money and items of value. Mail thieves often retain these items of value from stolen mail in order to make fraudulent purchases or sell the items to others in exchange for cash or drugs.

b.    It is a common practice for those involved in access-device fraud to use either false forms of identification or stolen, real forms of identification to make purchases with stolen access devices at retail stores in order to avoid detection and to complete the transaction. Those who engage in such fraud often keep evidence of such retail transactions in their homes and cars.

c.    It is common for identity thieves, and individuals engaged in bank fraud, access device fraud, and identification document fraud, to use equipment and software to print credit and identification cards, to create magnetic strips for credit cards, to use embossing machines to create credit cards, to use laser printers to create checks, and to use magnetic card readers to read and re-encode credit cards. Software relevant to such schemes can often be found on digital devices, such as computers. Such equipment and software are often found in thieves' and fraudsters' residences and vehicles.

15

d.    It is common practice for individuals involved in mail theft, identity theft, bank fraud, and access-device-fraud crimes to possess and use multiple digital devices at once. Such digital devices are often used to facilitate, conduct, and track fraudulent transactions and identity theft.  Suspects often use digital devices to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the internet.  They often employ digital devices for the purposes, among others, of: (1) applying online for fraudulent credit cards; (2) obtaining or storing personal identification information for the purpose of establishing or modifying fraudulent bank accounts and/or credit card accounts; (3) using fraudulently obtained bank accounts and/or credit card accounts to make purchases, sometimes of further personal information; (4) keeping records of their crimes; (5) researching personal information, such as social security numbers and dates of birth, for potential identity theft victims; and (6) verifying the status of stolen access devices.

e.    Mail and identity thieves often take pictures of items retrieved from stolen mail or mail matter with their smartphones.

f.    It is also common for mail and identity thieves to keep "profiles" of victims on digital devices.  Such "profiles" contain the personal identifying information of

16

victims, such as names, Social Security numbers, dates of birth, driver's license or state identification numbers, alien registration numbers, passport numbers, and employer or taxpayer identification numbers.

g.   Based on my training and experience, I know that individuals who participate in mail theft, identity theft, bank fraud, and access device fraud schemes often have co-conspirators, and often maintain telephone numbers, email addresses, and other contact information and communications involving their co-conspirators in order to conduct their business.  Oftentimes, they do so on their digital devices. Suspects often use their digital devices to communicate with co-conspirators by phone, text, email, and social media, including sending photos.

h.   Individuals involved in armed robberies and burglaries often maintain books, records, receipts, notes, ledgers, bank records, money orders, maps, and other papers relating to the planning and execution of the offense, as well as firearms and other weapons for use in the offense.  The aforementioned records and weapons are often maintained where the subject involved with the offense has ready access to them, such as the robber's residence, places of business, vehicles, and other locations from which the subject had planned the robbery.  Such records are also often stored on the robber's

17

cellular phones, smart phones, laptop computers, and other digital devices.  These devices are also often found in the subject's house and vehicle.

   i. Individuals involved in armed robberies often keep their firearms on their person, at or near where they live, including inside their vehicles, houses, and storage areas.

   j. Communications between people participating in the robbery take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of routes, targeted vehicles, relevant locations and tools required for the execution of the robbery.  In addition, it is common for people engaged in armed robberies to have photos and videos on their cell phones or computers of illegal proceeds, as they frequently send these photos to each other and others to boast about their illicit endeavors.

   k. Armed robbers often keep the names, addresses, and telephone numbers of their coconspirators on their digital devices and in their homes, residences, and vehicles. It is common for armed robbers to own multiple phones of varying sophistication and cost as a method to diversify communications between associates and robberies.  These phones range from sophisticated smart phones using digital communications

18

applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VI.    Training and Experience on Digital Devices

15.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

16.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data

20

during a search of the premises for a number of reasons, including the following:

      a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

      b.   Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

17.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII.    Conclusion

18.    For all the reasons described above, I submit that there is probable cause to believe that VELASCO and ROJAS have committed a violation 18 U.S.C. § 2114 (Armed Robbery of a United States Postal Carrier) and 18 U.S.C. § 924(c) (Carrying and Brandishing a Firearm During and in Relation to a Crime of Violence). I further submit that there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the SUBJECT OFFENSES, will be found on SUBJECT DEVICE 1 and SUBJECT DEVICE 2, as further described in Attachment A.


Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 4th  day of September, 2024.

_____
HON. STEPHANIE S. CHRISTENSEN
UNITED STATES MAGISTRATE JUDGE